Today's case is the Financial Oversight and Management Board et al. v. Cooperativa de Ahorro y Credito, Abraham Rosa et al. Appeal Number 22-1079, Appeal Number 22-1092, Appeal Number 22-1119, and Appeal Number 22-1120. Attorney González, please introduce yourself for the record and proceed with your argument. Yes, good morning. My name is Attorney Rafael González-Valiente in representation of Suiza Deity. As a preliminary matter, Your Honor, I would like to reserve time to respond to the cross-appellant's arguments on the cross-appeal and rebut any arguments that may be raised as to Suiza's own appeal. How much time do you want to reserve? If the Court will allow, I would like to reserve three minutes of the ten minutes which were allotted to us. That's fine. Before we proceed, Attorney Del Toro, please mute your camera and your audio so that you're no longer on the screen. Thank you. You may proceed. Thank you, Your Honor. May I proceed now? Yes. Good morning, Your Honor. Attorney Rafael González-Valiente in representation of Suiza Deity. The District Court held that the taking's claims could not be discharged by the plan of adjustment. But, on the other hand, the District Court incorrectly ruled that Suiza's claim was not on account of the taking at all, that it could therefore be impaired and discharged because it was based on a stipulation. But that's where the District Court erred. It was the taking itself that granted Suiza Deity's right to just compensation, not the stipulation. In accordance with Nick, the right to just compensation arose at the time that the taking occurred, not when the stipulation was signed. The fact that a taking occurred was validated. What are we supposed to do about the fact that there was never a finding that there was a taking? Yes, Your Honor. That's where we were going. There was no need for a court to validate the taking, since the promise to pay was implied because of the duty to pay imposed by the Fifth Amendment. This is from First English. The stipulation only captured what each party was willing to compromise to end the litigation. At no time did Suiza renounce its right to just compensation or agree that no taking had occurred. The important factor is that the mechanism for providing just compensation is irrelevant. And I quote from First English and Jacobs. The form of the remedy does not qualify the right. It rested upon the Fifth Amendment. Your Honors, Jacobs holds that even statutory recognition was not necessary. And to paraphrase First English and Jacobs, the fact that stipulation was signed or a judgment was not entered did not change the essential nature of Suiza Deity's claim. Did not change the essential nature. That is what the District Court failed to understand. Moreover, Nick, citing First English, shows that immediately upon the occurrence of a taking, the property owner acquires an irrevocable, and I repeat, irrevocable right to just compensation. The fact that a stipulation was signed cannot trump that irrevocable nature. We did not need a judgment. The Commonwealth never conceded that there was a taking. True, but Suiza did not renounce or hold that no taking had occurred either. And again, Your Honor, although there was no final judgment that we conceived, the District Court held 51 evidentiary hearings over the course of a year and a half. And at the end of that, held that a taking had occurred. And this was also confirmed by this panel on three different appeals, Your Honor. And a copy of those judgments and opinions and orders. Mr. Gonzalez? Yes. If I think the government has taken my property and the government says it doesn't think it's taken it, then I would have a right to go to court and persuade a court to give me a judgment and an award of just compensation. But don't I also have the ability to trade that right for a payment of money or a judgment for money and skip the whole takings issue? Because that's what I understand the other side is arguing. The other side is arguing that you may or may not have had a takings claim, but you traded it in for a stipulated agreement to pay you money. Well, Your Honor, we understand that Suiza did not trade it in. That right is irrevocable. But you traded, you got something, you traded something for something, clearly. There was a settlement, wasn't there? There was a settlement. Three minutes remaining, three minutes. What did you give up in the settlement? The parties agreed to settle because they wanted to end the litigation. In the part of the government that was especially important because they were being held in contempt. Because they had been disregarding the court's orders for over six years. And there was a contempt hearing already scheduled. That's why they came to the table to sign the stipulation. Suiza only agreed to receive the just compensation that it was entitled to. There was no need for a judgment to be entered. Moreover, and this is something that another mistake that the district court committed, was that our proof of claim was filed on account of a non-dischargeable regulatory accrual claim for U.S. constitutional violations involving the takings clause. And no party has objected to that claim. At worst, we have a right to have that proof of claim objected to because it was deemed allowed as filed. And there was no proceeding to disallow that claim or change the nature of that claim. As Varela and Farmers Court stated, there was no rule to allow for the objection to claim to be as part of the confirmation process. The evidence required for one procedure and the other are completely different. But like I said, Your Honor, and this is the crux of the matter. A taking cannot occur without just compensation. The Commonwealth, through O'Reilly, took Suiza Deity's property, took the equity in its plans. If they had taken the plans themselves, we would not be here, even if there was a settlement. Because everybody would agree that that taking had occurred. But the Supreme Court has held that all takings are identical. It doesn't matter if it's a regulatory taking, if there is condemnation, or if it's a per se taking. So, there was a taking, there was a right to just compensation. The only thing that Suiza agreed to was to be justly compensated, Your Honor. Suppose I have a tort claim against you, because your car ran into my car and injured me. And I file a tort claim for negligence, and then we settle it. And I agree to give up my tort claim, and you agree to pay me $100. You then don't pay me the $100. Do I still have a tort claim, or do I have a breach of contract claim? Your Honor, that's a very good question. I believe that you have a tort claim, and if I filed for bankruptcy, I could not discharge that claim, Your Honor. Isn't it a fact that when settlements like this occur, we treat it as a contract claim? And you can go to court to enforce the contractual agreement? And isn't that what the district court reserved the right to do, enforce the agreement? The same would happen if there was a judgment, Your Honor. The court would have the right to... I'm sorry. May I finish the answer? Yes. Yes, please. Yes. Even if it was not a contract, if it was a judgment, the court would still have the right to... There's really no difference. But, again, and if I may just finish this thought. It's the irrevocable nature of the takings claim that gives Suiza the right to collect as a taking. Not the fact that it was a stipulation. Suiza never, and there's nowhere in the stipulation that says that Suiza had renounced or said that no taking had occurred, Your Honor. Do you all have any other questions? Thank you. Thank you, Your Honors. At this time, please mute your audio and video. And, Attorney Ramos-Luina, if you could please unmute your audio and video, and you may begin by introducing yourself. Good morning, Your Honors. My name is Guillermo Ramos-Luina, and I represent six cooperativas de ahorro y credito from Puerto Rico, which, for purposes of this appeal, and for brevity purposes, I will refer to as credit unions. I would like to reserve two minutes of my time for rebuttal, if I may. Yes, you may. Thank you. Mm-hmm. If it pleases the Court, then. Yes. As I stated, my clients are credit unions who asserted a file, an adversary proceeding before the district court, asserting a myriad of claims against the government. The gist of their claims is that the government abused the regulatory powers over my clients and coerced them to purchase bonds at a time when the government knew, or should have known, that the government had no capacity to repay the bonds that they coerced my clients to purchase. The claims were litigated shortly before the confirmation order. The Court dismissed my clients' claims. That is subject of a separate appeal, 22-1048. Yet, on the confirmation plan, the Court decided that all of our, even should we prevail on appeal, all of my clients' claims would be discharged. Mr. Ramos, it would help me if you could explain why we even need to be here in this particular case on the takings claim, and let me tell you why. As I understand the takings claim that you are pressing before us on appeal, there are two issues. One is, does your clients have a claim for takings under the Constitution? And two, if so, can it be discharged? And it seems to me that on the first issue, your appeal from the ruling and the adversary proceeding is going to resolve that issue. And then on the second issue, as I understand it, the Board has already said that it agrees that if you have a takings claim, you'll be treated like the others who have a takings claim. And how they will be treated is going to be resolved on the Board's appeal from the Title III Court's determination of how to treat takings claims. So it seems to me that if we just put your appeal aside for a moment, those other two, resolution of those other two issues is going to resolve it. And I'd like to know if I'm missing something when I explain it that way. Oh, the way you explain it would definitely take into account the issues raised in this appeal and would ultimately solve them. So I would agree with your Honor's proposition that we treat it as such, at least as to the takings claims. And then on the fraud claim, I guess your problem is that the language in the code for non-discharging fraud claims has been deleted by Congress and is not included under Title III. So you're kind of stuck, aren't you, on that? Well, certainly that was the provision of the bankruptcy code that was not adopted by PROMESA. But yet PROMESA did adopt Section 105. And that is a provision that allows the court to issue any order of process or judgment necessary or appropriate to carry the provisions of the Title. And our claim, or our argument, I should say, that the fraud claims should not be discharged is a premise on two better principles of bankruptcy law, which are that discharge is a privilege. That's the first proposition. And the other principle is that discharge is only and exclusively reserved for the honest or unfortunate debtor. And we have filed claims asserting fraud claims against these debtors that would receive a discharge. And should we prevail on the fraud claims, then my clients would be discharged claims that, or these debtors, these fraudulent debtors would be discharged when that is contrary to those bankrupt principles of bankruptcy law. So the fact that PROMESA did not adopt that other provision, our contention is that through 105, 11 U.S. Code 105, the court could apply those better principles, which are the essence of what bankruptcy law is. Do you think that Congress doesn't have the authority to exempt fraud? Or to not exempt fraud, rather? Well, they should have, if that was Congress' intent, Congress should have said so. And there is nothing in PROMESA, reading PROMESA, that we can find that that was Congress' intent. Did Congress intend not to incorporate the better principles of bankruptcy law through 105? That is our contention, it did. By adopting 105, it adopted the better principles and the basis of bankruptcy law. And if I were to speculate, perhaps Congress never thought that a governmental agency could engage in fraud, and that's why they did not see it proper to adopt specifically that provision. But the reality is, as far as my clients are concerned, and the allegations that we have made in that bankruptcy adversary proceeding, is that fraud occurred, there was an abuse of the regulatory powers of the government, and that's why my clients were prejudiced by purchasing bonds when the government knew they would not be able to repay them. Anything else, Counselor? Thank you. Any other questions, panel? Thank you. Thank you, Attorney Ramos-Felina. At this time, if you could mute your audio and your video. And, Attorney Rivera-Rios, if you could unmute your audio and video and introduce yourself on the record to begin. Good morning, Your Honors, and everyone present here today. For the record, Counselor Victor M. Rivera-Rios, on behalf of Appellant Luis Pabon-Bosques, Robert Martinez-Perez, Edwin Rosa-Morales, Carlos Rosario, and Rafael Hector-Ramos. Your Honors, I'd like to reserve at least two minutes for rebuttal, just in case. Two minutes. Thank you very much. Your Honors, you know, I'm going to begin by arguing against the arguments that are filed in the brief with regards to regressible injury. They state that we have no regressible injury here in this case, but the fact of the matter is that the appellants, my clients, have retired after these Acts 81 were passed. And in these Acts 81, they had a pension, a right, for 50% to 55% of their lease salary. The prior Act that was invalidated was Act 3, which was 40 to 44%. But, in fact, in the Supplemental Appendix 150-151, you'll find an Oversight Board letter where it confirms that the government and the Oversight Board agreed not to implement that Act 81. And they have been suffering because they have not been receiving the difference between Act 81 and Act 3. That difference is more than $1,000 for each person, for each appellant. And they've so far, you know, since they've retired since August of 2020, they have not received more than $19,000 in pension funds. And that's their regressible injury that we're seeking here, Your Honors. They also argue that this appeal is not timely because we didn't appeal the approval and stipulation order. We understand that this is the final judgment rule. In the case of INCRE, BWS Holdings, 228F3-224, which says that this appeal stems from 28 U.S.C. 1291, which indicates that any order that could be appealed is the final judgment order. Now, the final judgment order here is the confirmation order. The confirmation order incorporates, by reference, the approval and stipulation order that was entered in December 28 of 2020. If we look at the approval and stipulation order, it says that the Act 81, the party shall never to reach an agreement within 60 days with regards to enhanced retirement benefits. And at the end, it says that the court's approval of this agreement shall invalidate Act 81. Based on my understanding, reading this court order, I understand that Act 81 is being invalidated and being declared null and void and preempted. Mr. Rivera, didn't that happen in another proceeding that you did not intervene in? The adversary proceeding did not. So, what occurred here, Your Honor, is we filed a motion to lift the stay because we had filed another claim against the government, which was stayed. The court denied that stay on December 20th, denied the lift to stay, and indicated that the government was going to file an adversary proceeding. And that adversary proceeding was actually filed on December 20th. Seven days later, an agreement is reached. And that agreement was entered on December 27th. So, there was just a weak time for us to try to intervene. And this agreement was reached between the oversight board and the government. And then an agreement that not only is not even in any of the record of this case, Your Honor. They said, we're going to reach an agreement in 60 days. Sixty days passed. Nothing on the record reflects what agreement was made with regards to enhanced benefits. They make reference to a motion that was filed to inform that there was a stipulation on appendix 95 and supplemental appendix 159. And it only makes reference that an agreement was reached. But it says no details whatsoever as to what was the agreement. Let me see if I could just slow you down just a bit. Sure. What I hear you saying, correct me if I'm wrong in response to my question, is that the status of those acts was adjudicated and a judgment entered in another proceeding. But it all happened really fast in seven or eight days. And you seem to be implying that because it happened fast, we should disregard it. Or you should have an ability to collaterally attack it in a subsequent proceeding. What I understand is the adversary proceeding is part of this whole bankruptcy, Your Honor. This proceeding, this stipulation was made by the same court, the same bankruptcy court that later incorporates it in their findings of facts and their confirmation order, which is a month later. So you would say that any and all adversary proceedings that took place in the Title III court in the course of any of these bankruptcies can be collaterally attacked when it comes time for plan approval? This adversary proceeding was filed and it was trying to change the fiscal plan of adjustment, Your Honor. And if this adversary proceeding would have continued, no plan would have been entered by January 18th of 2022. So once this adversary proceeding was culminated with this agreement, then finally the court was able to enter that confirmation order. So I understand, Your Honor, that this final judgment rule that I was invoking earlier, 28 U.S.C. 1291, allows us to appeal to that order. But you can appeal from a ruling in an adversary proceeding, and you didn't. Your Honor, apparently that agreement said it was 60 days that they were going to enter an agreement. No agreement has been entered. So how could the applicants file an appeal as to a stipulation that's not even on the record, Your Honor? There's no agreement on the record as to what's the enhanced benefits that's the reason why they invalidated Act 81. And that's one of the reasons why we understand that there's little findings of facts here, and this confirmation order should be reversed as to Act 81. Can I ask just a follow-up question to Judge Kayada's questions with respect to the fact that you did not intervene? So in December of 2021, things were moving very quickly in an attempt to get to confirmation. Do you have some argument that you weren't on notice that things might happen quickly? I'm trying to understand why seven days wasn't enough time to intervene. Well, Your Honor, it just occurred within that seven-day span. What occurred earlier was that they had the evidentiary hearing in November. And in the evidentiary hearing, they mentioned they wanted to preempt Act 81. And there's a court order in Supplemental Appendix 5 where the court admits that there's no fact-finding to preempt Act 81 because it was submitted after close of evidence. So because the court was not going to preempt Act 81, this adversarial proceeding was filed in December 20th, at the same time that the court did not allow us to lift the state. And then after just seven days, they proceeded to enter an agreement saying that we're going to agree to agree in 60 days. And 60 days have passed. Presently, I have not seen any agreement whatsoever as to what they're going to do with the enhanced benefits. This is clearly a part of the confirmation process to be reversed. Counsel, did you seek to intervene after the seven days? After the seven days? Yeah. No, Your Honor, I was just waiting for the confirmation order. Thank you. Were you at all aware of what the terms of the settlement agreement was? To this day, Your Honor, there's nothing on the record with regards to what's the terms of the settlement agreement. I understand that, but were you aware of what the terms were, what the agreement entailed? The only thing that the agreement says is that they will endeavor to reach an agreement within 60 days of the date of this agreement. That's the only term. Any other questions? Thank you. Thank you, Attorney Rivera-Rios. At this time, you can please mute your audio and your video. Attorney Bienenstock, if you could unmute your device and introduce yourself on the record to begin. Attorney Bienenstock, are you in the meeting? Yes. Okay, great. I'm sorry, I was just... That's fine. When you're ready, just introduce yourself on the record to begin. I can't see your camera, I will say. I can see it. Okay, great. I can't see him. Judge Howard, can you see him? Yes. So it may be local to some of us. Jim? Jim, what should I do? Okay. Yeah, and then turn it back on. I still don't see him. Oh. Okay. Yeah. That actually worked for me. I had the same issue. Okay, large gallery then. Okay, I see him now. Thank you. Thank you. At this time, Attorney Bienenstock, if you could just reintroduce yourself on the record to begin. Thank you. Good morning. My name is Martin Bienenstock. May it please the court. I'm an attorney for Prospero Rose, LLP. We're here representing the Financial Oversight and Management Board for Puerto Rico as the Title III representative of the three debtors. What I plan to do is to address briefly the three arguments your honors have heard and then to go into the board's Fifth Amendment appeal. In respect of this last argument, only because it's fresh, Mr. Friedman, representing AFAF, will address it more fully, but I just want to make one point. We disagree strongly with counsel who said that the settlement was going to be done in 60 days. That's not what happened. The legislature passed laws that would have upended the entire plan of adjustment by creating defined benefit plans, which the plan of adjustment got rid of in favor of defined contribution plans. So we started an adversary proceeding to nullify those laws. We settled with the government, invalidating all three laws. The settlement included precatory language that we would undertake to see if we could do something for the people affected, but that was by no means necessary for the settlement to be effective. The settlement was to invalidate the laws, and that's what it was, and it was all public and filed, and everyone saw it. Now I'll move on to Suiza and then the cooperativists. May I reserve four minutes for rebuttal after the government goes? Yes. Thank you. In respect of Suiza, Suiza contends its proof of claim is for a taking, and this court confirmed the preliminary injunction was to remedy a taking, even though this court did not. As shown by the Title III Court's opinion at FOMB addendum, pages 114 to 116, and contrary to Suiza's contention in its reply brief at page 21, that this court, quote, confirmed that the current milk price scheme clearly represents a taking of property for the milk processors by not allowing them to recover their true costs and the allowance of a fair profit, end of quote. This court did no such thing. After Suiza procured a preliminary injunction ordering it could recoup its investment by charging higher milk prices to consumers, the Commonwealth appealed. One of its grounds was that the Federal District Court lacked power under the 11th Amendment to issue a money remedy against the Commonwealth for a taking. While this court affirmed the preliminary injunction, it rejected the notion that the preliminary injunction was a money remedy for a taking. Not surprisingly, this court did not determine issues the District Court had not finally determined. Rather, it decided the issue the Commonwealth raised on appeal, namely that the 11th Amendment barred money remedies for takings. At pages 479 to 480 of this court's opinion, in Bacteria Tres Monitas Inc. v. Irizarry, 587 F. 3rd, 464, this court ruled in favor of Suiza, rejecting the Commonwealth's 11th Amendment argument, and wrote, quote, After the Commonwealth lost its appeal of the preliminary injunction in this court's Irizarry decision, the Commonwealth settled with Suiza. The settlement provides the Commonwealth would pay some money to Suiza, and Suiza would recover other money by charging higher milk prices for a certain term. Suiza cannot meritoriously argue the essence of the settlement is a claim for a taking, when no court ruled there was a taking, and the remedy was ruled an equitable remedy by this court, and there was no right to payment from the Commonwealth until the settlement. As the settlement agreement provides in its paragraph 14 at Suiza Appendix page 8, the Commonwealth volunteered to pay some money so consumers would not suffer larger price hikes. Second, Suiza reply brief at page 28 contends the board cannot object to its claim in the planned confirmation hearing, and must bring a claim objection. There's a very short, simple answer to Suiza's lengthy discourse about its proof of claim being unattackable in the confirmation hearing. Namely, some confirmation issues overlap with claim allowance issues. The mere fact that a confirmation issue involves an issue also relevant to a proof of claim does not mean the confirmation issue cannot be determined at the confirmation hearing. What happened here is Suiza objected to confirmation. Its objection is at Suiza Appendix page 352. At page 379, Suiza contends the plan of adjustment incorrectly depicts the debt owed to Suiza in nature and amount. That is what led to the resolution of confirmation of the nature of the claim. The board responded to Suiza's confirmation objection, contending Suiza did not have a taking claim for classification purposes. Classification, as shown by Banksy Code Section 1122, is a pure confirmation issue. Additionally, Suiza's argument that claim objections are private two-way hearings is at odds with this court's decision at 872F357 in these Title III cases, that in Title III all creditors have an absolute right to intervene in PROMISA adversary proceedings in contested matters. The Varela case that Suiza cites was basically not on point. There, a debtor tried to hide a claim objection and amount in its plan, and the court nailed it for that. Suiza's reply brief at pages 2 and 37-41 argues the plan illegally discharges non-debtors when it calls the public at large. By providing Suiza cannot recoup any discharge claim by extending the term of the regulatory accrual scheme that allows the increase in the price of milk. Suiza's own words, I quoted at page 38 of its reply, show it's not talking about releasing third parties. It's talking about extending the term consumers must pay higher milk prices. Consumers have no debt to Suiza. Suiza cannot sue them if they decide not to buy milk. Plain and simple, non-debtor releases are not an issue here. The public at large owes no debt to Suiza and has no obligation to purchase its milk. Finally, section 51.C of the plan of adjustment provides that nothing in the plan impacts that regulatory scheme. Finally, Suiza opening brief at page 5 contends the district court erred in concluding Suiza's claim was unsecured. The Suiza confirmation objection starts at Suiza appendix page 352. At page 380, Suiza objects that the plan does not treat its claim in accordance with Bankruptcy Code section 1129B2B. That subsection governs how unsecured claims must be treated. The leading clause of that subsection is, quote, with respect to a class of unsecured claims, end quote. Additionally, like all takings claimants, Suiza fails to identify what its collateral is. That's because it has none. Suiza cannot contend below it has an unsecured claim and then deny it here in the First Circuit. In respect of the cooperativas, as your honors would expect, we totally agree with the trend of the argument that we heard earlier. Their takings issues are really not issues here. They're for the other appeal and the outcome of the Fifth Amendment appeal. And if Congress wanted to make fraud an exception to discharge, it clearly knew it could because it did that in individual cases, but not here. I'm sorry to interrupt you. I lost him again, and it looks like Judge Howard may have lost him. Yes. I did, too. It seems spontaneous. I could hear him just fine. There he is. He's back. Okay. I'm sorry. In respect of the cooperativas, I was just about to say that Section 105 says by its terms it's to carry out the provisions of the statute. It doesn't say it's to override them or expand them. In respect to their argument that we should not have raised Section 510B of the bankruptcy code that's incorporated into Title III, I would simply say this court doesn't have to deal with 510B. We just pointed out that even if the cooperative has established a fraud claim, because it's fraud in their purchase of securities, bonds, it would be subordinated and they would get nothing, so there's really nothing for them on that argument. Unless the panel has other questions, I'm going to turn to the Fifth Amendment appeal. I plan to start with two big-picture observations. The U.S. Constitution allows for no violations of the freedoms of speech, religion, assembly, and other fundamental rights, yet appellees contend violations of them yield dischargeable money claims. Conversely, the U.S. Constitution allows takings if just compensation is paid, but appellees contend claims for just compensation are not dischargeable. There is no rhyme or reason to such an arbitrary distinction. Judge Swain exercised her discretion under 944C. Could you speak first about what the standard of review is for us with respect to your appeal? Do we look at it as her abusing her discretion, or are you saying that as a matter of law she did not have the authority to do what she did? I'm making three points. First, we respectfully disagree that Judge Swain exercised her discretion. We agree that early in the consideration of this issue, the judge asked the parties to brief 944C, and if that pertains to the court's discretion, that would be included. We would submit as a side that it's not discretionary whether you make a claim non-dischargeable. But while the court asked the parties to brief that, that's not the basis on which the court ended up deciding it. As we say in our reply brief, 14 different times the court emphatically ruled that as a matter of law, the takings claims have to be paid in full or otherwise left to be non-dischargeable. So we don't think the record bears out that it was an exercise of discretion. Let me follow up on that then with a practical question. Let's assume that the judge did not exercise 944C on discretion, and let's assume that on this appeal we then decided the constitutional issue, and we decided it in your favor. If we did that, then what would happen is it would have to be a remand at which the alternative argument, i.e., the 944C1 argument, would then be decided by the Title III Court. And if the Title III Court ruled against you on that issue, and we then affirmed it, we would have found ourselves in the position of having decided a constitutional issue that turned out to be totally unnecessary to decide. So to avoid that, wouldn't it make sense to do a limited remand now so that the judge could make an alternative 944C1 argument based on constitutional avoidance? Okay. Your Honor, the Court obviously has the power to do it. We think it should not exercise that power for the following two reasons. First, saying something is non-dischargeable costs money, and that money is going to be taken away from other uses under the plan. So we don't think this is a matter of discretion. Second, as we pointed out in our brief, when it comes to an abuse of discretion, if there's an error of law, that is an abuse. So we think this Court really has to decide the constitutional issue regardless, because if the Court was wrong and the 14 times she said it has to be paid in full, then that is automatically an abuse of discretion. That wouldn't mean you prevailed. It would just mean she needs to turn to the 944C1 argument. And as I read your brief, all you had to say about 944C1 was that it doesn't do anything. And that's an odd position to take regarding the term of the statute. Well, we didn't say it doesn't do anything, but what I'm saying here, and perhaps we should have explained it more, is it's not discretionary that courts can just lob claims into the non-dischargeable bucket. If you get to confirmation and there's a dispute, and perhaps it's settled by saying, oh, let's settle it by making this claim non-dischargeable, the Court can put that in the confirmation order. But it's the debtor that has the exclusive right to draft the plan. If the Court doesn't like the plan, it can deny confirmation. It can't say I'm going to rewrite the plan by my deciding that a bunch of claims are non-dischargeable as a matter of discretion. This has not been litigated before to my knowledge,  So you're saying we could read 944C1 as saying that a court can treat a claim as non-dischargeable, but only if the parties have agreed to that. Or there's another legal basis for it. But what other legal basis would there be? I can't think of any, because the statute says the debtor has the exclusive right. Your argument is saying that 944C1 gives the Court essentially no power to do anything unilaterally. Well, that changes the plan. That's right. So getting back to the big picture, think of a tilde tries to address the no rhyme or reason between saying takings are non-dischargeable but all the other constitutional violations are dischargeable by saying at page 19 of its brief that there is no money remedy for the violations of the other fundamental rights, like freedom of speech, etc. But that's just plain wrong. If speech is censored unconstitutionally before Election Day, that can't be cured by allowing a person to speak after Election Day. Of course there are money damages. But the fact that they would strain to show that argument shows there's really no rhyme or reason. Also, there's another situation. But they say those other constitutional guarantees don't have the same remedy, whereas the takings clause does have a constitutional remedy, which is just compensation. So that's how they distinguish one from the other. Well, they do. But what's wrong with that argument? What's wrong with it is that it's implicit that the violation of it yields money damages. The only difference in the takings is it gives you a formula to determine it, which is a formula for just compensation. It's like a liquidated damage clause. It has nothing to do with that. Your position would be a radical expansion of Bivens, wouldn't it, to create a money damage claim for any of these other constitutional violations? It's not in the Constitution. It's not in the statute. So where do you get it other than expanding Bivens way beyond the facts of Bivens? Oh, no. We're not expanding Bivens at all. The Supreme Court has acknowledged, for instance, in Nick, that even a claim under the takings clause is brought under 1983. Wherever constitutional rights are enforced under 1983, and there have been money damages, they're dischargeable. And that's acknowledged. We're not expanding Bivens at all. And that's not a controversial fact, that money damages under the Constitution... So you're saying that 1983 action applies... I see. You'd say it applies to... You treat Puerto Rico as a state and apply it that way. Right. And Nick says takings claims are brought under 1983. But then what do you do about takings by the federal government? You can't bring a 1983 claim for the First Amendment violation by the federal government. Okay, but you would just bring it under the Fifth Amendment. And where would you get your damage claim for a free speech violation? Oh, I didn't know you were... I thought you were talking about takings. Well, no. So takings, the Constitution tells us what the remedy is. The Constitution's silent on the others. And if it's the federal government acting, I go back to my question. Where do you get your claim for money damages? Well, fortunately here, we're talking about an action by the territorial government and not the federal government. So I don't have an answer for you. That's time. Thank you, Counselor. Any other questions? Thank you. At this time, Attorney Bienenstock, you can mute your audio and video. Attorney Friedman? Good morning, Your Honors. Peter Friedman from O'Malley & Myers on behalf of the FAFSA. I want to address specifically the argument with respect to the approval order and the adversary proceeding and the plan of adjustment confirmation orders with respect to Acts 80-82. I agree with Mr. Bienenstock. The adversary proceeding order entered on December 28th was effective that date. That's what Judge Swain's signature on the approval order indicates. I think of note, the order very specifically says that the statutes being invalidated were subject to the powers of the oversight board with respect to fiscal plans, which is a Title II power, not a Title III power. So these were really not connected in the order to the plan of adjustment and can't be merged into the plan of adjustment. As the court noted, there was no attempt to intervene in the time the adversary proceeding was pending. Moreover, not only was there no attempt to intervene, there was no attempt to intervene after the adversary proceeding order was entered. There was no motion for 60 reconsideration and no attempt to file an appeal by January 27th when that appeal became final and the 30 days after the order was entered. A confirmation order was entered on January 18th. It referenced the approval order, but it did not incorporate it by reference. To the contrary, it noted that the subject matter of that approval order was no longer a part of the confirmation proceedings, did not include Acts 80 through 82 on the 67-page list of statutes preempted by the confirmation order. I think that's our whole point about no injury in fact. We don't quarrel with the allegation that people may have been harmed. We don't agree, but the issue that's standing here isn't about whether somebody may have suffered a theoretical injury in some other capacity. It's whether the confirmation order, which is the subject of this appeal, inflicted an injury upon appellants. And the answer to that is clearly no, because Acts 80 through 82 are just simply not a part of the confirmation order. I don't know why appellants chose not to appeal the adversary proceeding. I don't think they would have been successful in any manner, but they clearly didn't. I think their argument that I heard today is they view the judgment in the adversary proceeding as having merged into the judgment approving the plan, and hence they're under merger doctrine appealing that portion of it now. I think that's what their argument is. That is the argument. I would note, A, that on their notice of appeal they didn't list the approval order or the adversary proceeding as something they were appealing or as one of the subsidiary orders that they intended to appeal. And I just think it's so clear from Judge Slane's approval order, entering dismissal of the adversary proceeding with prejudice on December 28th, that it's a separate proceeding. Again, it was mentioned in the confirmation order that Acts 80 through 82 had been preempted, but that preemption was not incorporated by reference. And so I think, Your Honor, if I may finish just very briefly, for the merger doctrine to apply, it would have to be a proceeding that was involved in the plan. For example, perhaps a disclosure statement or a discovery ruling on the plan, not an entirely separate adversary proceeding. Thank you for your time, Your Honor. Thank you. At this time, please mute your audio and video, and Attorney Winnick, introduce yourself on the record to begin. Good morning, Your Honors. May it please the Court, Daniel Winnick for the United States as intervener. This Court need not and should not decide whether the discharge of just compensation claims would violate the takings clause because the district court properly excluded such claims from discharge before confirming the plan of adjustment, just as the bankruptcy court did in the landmark city of Detroit bankruptcy. That ruling should be affirmed on the ground that the discharge of such claims would raise serious constitutional questions, whether or not it would actually be unconstitutional, which is an issue on which we take no position. In addition to avoiding a difficult constitutional question, an affirmance on that ground would also avoid creating a split with the Ninth Circuit's decision in the city of Stockton, which went out of its way to note that the creditor had not sought an exception from discharge. Now, if the Board takes the view... I'm sorry, do you view Judge Swain's decision as a 944C1 exemption? We do, Your Honor. We think it clearly creates an exception to discharge. I realize the actual findings, effects, and conclusions of the law don't expressly mention 944C1, but I think it's reasonably clear that's what the district court was relying on, and in any event, the court could affirm it on that ground, assuming it is, in fact, an exception to discharge. Let me just explain... Time out. As I understand, your interpretation of 944C1 is it grants the Title III court the discretion to decide that something will not be discharged. That's correct, Your Honor, and we think... And so I've scanned through the lines and between the lines of the judge's order, and I can't see any indication that the judge purported to bring to bear that discretion, so how could we affirm an exercise of a discretionary ruling if the court below never got to it because the court below relied on the constitutional grounds? So, Your Honor, let me explain the two points in the district court's opinion that I think most clearly show that what the court was doing was creating an exception to discharge. So the first is footnote 15 at pages 38 to 39, where the court explains that it's not waiting for the United States to file a brief in defense against the constitutional objections because it, quote, rejects those constitutional challenges. The reason the court rejected the constitutional challenge was that it had directed that the plan be modified to provide for full payment of the just compensation claims. In other words, it accepted those claims from discharge. The second place is page 57 of the opinion, where the court explains that the plan, as submitted, did not exempt the just compensation claims from discharge and goes on to, quote, conclude that those claims, quote, are not subject to impairment and discharge and, therefore, that the, quote, claimant's assertions that their claims should be paid in full or deemed non-dischargeable are sustained. Now, if the board were correct that there sort of wasn't an exception to discharge here or that, you know, Title III courts or Chapter IX courts couldn't create exceptions to discharge, as you heard from Mr. Bean and staff today, then the only remedy, if it were unconstitutional to discharge just compensation claims, would be to hold the statute unconstitutional as applied. The district court plainly didn't do that. Nobody's advocating that for good reason. And so we think it's pretty clear that what the district court did here was to create an exception to discharge of those claims. We certainly don't dispute that the reason the court gave for accepting the claims from discharge was that it thought discharging the claims would be unconstitutional. We don't think the court needed to go that far, and we've asked this court to affirm the exception on the narrower ground that discharging the claims would raise serious constitutional questions. But I do think it's reasonably clear from the district court's opinion that what the court was doing, the actual ruling on the bill... What do you view as the parameters of the court's authority under 944? So, Your Honor, I think the authority is fairly broad, but this court can rule on a quite narrow ground here. I don't think the court has to delineate the broad parameters of the authority. I think there are two things about this case that make it especially clear that the court's exercise of authority was proper. One is the constitutional avoidance overlay, the fact that exercising the authority was proper to avoid resolving hard constitutional questions. The other point is that there is no provision here that enumerates particular types of claims as exempt from discharge. If there were such a provision, I think it would be a much harder question whether Section 944C1 allows the court to deem a claim non-dischargeable that is not deemed non-dischargeable by an applicable statutory provision. But there's no such provision here. I also think, by the way, the court doesn't have to say that the court had to accept these claims from discharge. I think what we're asking for is narrow in three different ways. All we're saying is that the exception from discharge was proper, it was proper given the serious constitutional avoidance concerns, and it was proper given the absence of a statutory provision setting forth particular categories of non-dischargeable claims. Given all of that, we think the court's exception of these claims from discharge should be affirmed. Counsel, you may have to repeat yourself. I apologize for that. One piece I'm not quite understanding yet is if we do not accept your position... I'm sorry. Right. If we accept the FOMB's position that takings are not exempt themselves, if we accept that, and if we do not accept your position that there was a 944C ruling here, how is it that we can then, ourselves, sort of do a 944C? How do we know that the district court, knowing that it did not have to exempt these claims from discharge, would nevertheless do so? So I think if the court reads the district court's opinion as purely constitutional, and if it thinks that the Constitution... If it thinks, if it has serious doubts that the Constitution compels excluding just compensation claims from discharge, I think it probably would be proper to do what Judge Tejada suggested earlier and issue a limited remand to avoid the need for this court to resolve a constitutional question unnecessarily. Right? The court could issue a limited remand and say, you know, we don't... We're not sure whether you were exercising discretion. We'd like you to consider whether, given sort of an express statement of that discretion, you would exercise it to accept these claims from discharge. And then the court could, as necessary on a resumption of this appeal, address the constitutional question if it had to. I think the court should avoid resolving the constitutional question, which is a hard one, unless it needs to do so. About four minutes. Last four minutes. I think a limited remand would be a sensible way of avoiding the need to do that. What do you say about the board? If I understand correctly, one of the board's arguments that was advanced today is that we should read 944C1. To avoid reading it as superfluous, we could simply read it as saying it allows the court to approve a plan in which the parties have agreed to treat something as non-dischargeable, but it grants the court no power to condition approval of a plan on the non-dischargeability of something that the parties did not agree to. I think that's what they're saying. I also think that's what they're saying, and I don't understand how it is consistent with the text of the statute. I would regard that reading as rendering surplusage the language order confirming the plan. Section 944C says the debtor is not discharged from any debt quote, accepted from discharge by the plan or order confirming the plan. They focus on by the plan, but I don't see what independent meaning that gives to order confirming the plan. I think it's reasonably clear from the text of the statute that it does give a court some power to accept claims from discharge that are not accepted from the plan, that the parties have not agreed should be discharged. I think whether or not that would be the court's straight-up reading of the statute, I think there's very good reason to adopt that reading as a matter of constitutional avoidance. Ours is an entirely reasonable understanding of the statute, and it's proper to allow the avoidance of a hard constitutional question here. I'd be happy to address any questions the court may have about the merits of the constitutional issues. There's several counsel following me, and I'm happy to leave those issues to them, but I'm happy to speak to the issues if the court has questions about them. Again, our position, the position of the United States is not that it would be unconstitutional to discharge the just compensation claims, simply that the constitutional questions are quite hard ones and that, therefore, it was sensible to avoid the need to reach them. Thank you. Are you familiar with Collier's discussion of 944C1, and how would you have us regard that if you are? I am familiar with Collier's discussion of it. I think I would have the court regard it as incorrect, at least in the context we're talking about here, where there are serious constitutional avoidance concerns. I also think that it's possible our position is consistent with what Collier's says. I mean, I'm trying to find the language, but it is something to the effect that there's no sort of... 944C1 doesn't allow courts to sort of create, you know, very broad, equitable, you know, carve-outs  particular types of claims, and we're not suggesting that, you know, courts have kind of willy-nilly discretion to decide this claim is dischargeable and this claim isn't. You know, all we're suggesting, and this is what the bankruptcy court suggested in the city of Detroit, or held in the city of Detroit, is that where discharging claims would give rise to serious constitutional questions, it's a proper exercise of discretion under 944C1 to accept those claims from discharge. Collier's just doesn't address that sort of narrow framing of the authority, and I think Collier's skepticism about the broader framing is wholly reconcilable with what we're asserting here. Thank you. Thank you, Your Honors. At this time, Mr. Winnick, please mute your audio and video, and Attorney Del Toro Sosa, if you could unmute your audio and video. Good morning, Your Honors. I'm Russell Del Toro Sosa on behalf of PSC. I have some introductory remarks, Your Honor, regarding certain aspects that you should consider when deciding this case. You should consider that eminent domain claimants are passive and involuntary casualties of the decision of the government to take their property for the specific purpose of dedicating it for the common public use. The government simply takes the property without their consent by exercising the sovereign power to seize it. The founding fathers, anticipating that circumstances would arise where the common good would trigger the government's need to take the home or property, carved into the Constitution an absolute condition for the payment of just compensation. The Supreme Court's jurisprudence defining just compensation and affirming the duty of payment of just compensation is very well known and not in dispute. The Constitution granted Congress the power to enact bankruptcy law. That is also not in dispute. However, the board argues without merit that somehow the bankruptcy procedure trumps the takings clause. For example, the Constitution also grants Congress the power to enact laws, but no one argues and it's common knowledge that when Congress enacts laws that infringes the Constitution, the court strikes them down. Similarly, the fact that the Constitution grants Congress the power to enact bankruptcy laws does not entail that Congress can ignore or curtail the strictness of our Constitution. Because the takings clause jurisprudence is so well known, it's unconceivable that Congress, in enacting PROMESA, had any intention to infringe it. The district court correctly warned that the original proposed plan could not be confirmed as submitted because it would be contrary to law. In this case, the takings clause. The courts also suggested the solution, exemption of these claims from discharge, be it by the plan itself or by the order of confirmation. Both are pursuant to section 944C1, which you were discussing priorly. Confronted with the court's firm determination that the plan could not be confirmed as submitted, the board had two alternatives. One, conform and resubmit the plan to comply with the takings clause, or two, simply refuse to do so. Here, the board submitted a compliant plan, but also exempted these claims from impairment or discharge, and that's the wording of their proposed plan. The court approved that last provision to the alternate compliant plan and specifically decreed that these takings claims do not be impaired or discharged, but be paid in full interest. It is likewise clear that the only source of the court's power not to discharge these claims precisely arises out of section 944C1, which is consistent with her November 12th, 2021 order, as well as her subsequent orders. The fact that the court explained the reasons supporting the decisions show that the final confirmation order was well within the court's discretion in reconciling and correcting portions of the plan that could and would have rendered it invalid. Those reasons are the same that were laid out in PSC response brief, as well as the copious memorandum PSC filed before the district court, and we held that both in the exercise of discretion and on the merits, the judgment should stand. Did the court ask any questions? Just to back up a little bit, so your position is that once a plan was submitted that discharged the takings, that at that point, the board had an obligation to appeal rather than accept it and prepare another one? Well, the board had the option of submitting a plan. The plan is submitted by the board. The board accepted to submit a plan where the board itself was not discharging these claims and comported it to the takings plan. In other words, the board decided voluntarily to go along with the court's suggestion and the court affirmed that and approved it. I'm sorry. I'm a counselor. I'm trying to figure out if they disagreed with what the court wanted to do, what would their option have been? Well, are you saying that they could have appealed something at that point? Well, they could have simply A, said, well, no, we don't agree with your honor and go ahead and make the modifications yourself. And they did not do that. They said, okay, we agree. We'll submit the modification. It said, well, we might appeal. They did not say we're going to appeal this. If the board appeals and then they submitted an alter plan for payment of full, which they did not have to do by merely accepting. And as they did, they accepted these claims from discharge. It's superfluous to say that they're going to be paid in full, but they opted also to pay them in full. They did both things. Okay. Thank you. Thank you, attorney Del Toro. Sosa, you can mute your audio and video at this time. Attorney Capdevila, introduce yourself to begin. Hi. Good morning to the panel and everyone else. Eduardo Capdevila on behalf of Finca Matilde. Well, first we would like to address a threshold issue that has been currently keep repeating, that the board and other parties keep referring to the issue as the discharge of taking claims. Well, discharge is a two-sided coin. Our issue is not that we are discharging claims. It's that the board seeks to discharge the sovereign's obligation to pay just compensation. And looking at it from that different perspective does make a difference. Because the Fifth Amendment specifically states with respect to the takings clause that the government cannot take property without paying just compensation. And that's precisely what the board wants to do. The fact that it was pre-petition or post-petition makes no difference because at the very end the sovereign took property and does not want to pay it. Actually, the confirmation of the plan as submitted by the board would in fact be a judgment stating that it will not pay full compensation. Now, as for the distinction whether the First Amendment rights are damages or that the Fourth Amendment or the other clauses within the Fifth Amendment are damages, that is not the same for the takings clause because the takings clause is substantially different from the rest of the other clauses within the Fifth Amendment. As Judge Brewer in the Mananjela case precisely stated, all other clauses within the Fifth Amendment are personal. But the takings clause is for the property. And the court should know that the board did not attempt to differentiate that case from the rest of the cases cited. So with that respect, I think it's settled that the takings clause is not the same as the rest of the clauses within the Fifth Amendment. And it's not damages. Our position, as stated in our brief, is that to accept the board's position that they are dischargeable would in fact enlarge the government's power because the Constitution, our fundamental law, precisely states the government's limits towards its citizens. That is the power granted to the government. If the government is allowed to create a hiatus for that obligation or an exception, it would in fact be enlarging the government's power beyond the Fifth Amendment because it allows government sovereigns to take private property without paying just compensation. Now, with respect to the panel's question regarding that if the standard of appeal would be abuse of discretion, in our brief we understood that it was resolved in the merits. However, listening to the arguments of the other parties, the fact is that the court did not need to address the issue based on the Constitution because actually, as the panel can see, in the December 14th order, which is the only addendum in our brief, the issue was that by not paying inverse condemnation and eminent domain claimant, the plan would not comply with Section 314 of PROMESA. It specifically makes 314a.3, which requires that to confirm a plan, the debtor is not prohibited by law from taking any action necessary to carry out the plan. In this case would be not pay just compensation for the property it took. Or 314a.c, which requires the board to consider under non-bankruptcy law and Constitution of the Territory would result in greater recovery for the creditors than provided for in the plan. Therefore, if the court would analyze it under an abuse of discretion standard, the court complied. The court asked the board, how would that affect the other creditors? The board answered, it would not affect the other creditors. We have enough money to pay everyone on the effective date. So the decision is based on the facts of the case submitted by the board itself. It has support not only in the plain reading of the Fifth Amendment, its jurisprudence, and it also has support within Section 314 of PROMESA. So even under an abuse of discretion standard, the Title III Court acted correctly and did not commit the errors alleged by the board. Thank you, Counselor. Thank you, Attorney Capdevila. At this time, you can mute your audio and video. Attorney Cuprell, if you could unmute your audio and video and introduce yourself on the record to begin. Good morning. My name is Charles Cuprell, and I represent the members of the State of Pator Mande Mercado. Adding to the arguments that have been expounded by my two other attorneys in this case, I just want to point out that the principles of the taking clause requiring just compensation apply equally to quick take as well as inverse condemnation proceedings, which is a situation of our appeal, of our plans. And this has been recognized in NIC. It places no limitation on the compensation by stating that it must be just, equivalent to the value of the property at the time of the taking for public use. This fore-expressed substantive constitutional mandate cannot be nullified by any bankruptcy provision under the bankruptcy powers of Congress granted by Article I, Section 8 of the Constitution or pursuant to any plan of adjustment. Congress bankruptcy powers are subject to the Fifth Amendment as has been held by the Supreme Court in the cases cited in our brief. Eminent domain claims are not dischargeable in bankruptcy and must be paid in full under the plan. As of the date of the taking, regardless if they arose prior to or after the Title III petition filed we have on the proviso. The taking clause makes no distinction. The Supreme Court in NIC clearly held the Fifth Amendment right to full compensation arises at the time of the taking regardless of post-taking remedies that may be available to the property owner. The compensation must generally consist of the total value of the property when taken plus interest for that time. And this is exactly what the plan provides for. Thank you, Counselor. Thank you. At this time, Attorney Cuperl, you can mute your audio and your video. And, Judge, I believe we're going to hear in rebuttal from Attorney Gonzales-Valiente. Yes. If he could unmute his audio and video at this time. Yes. And reintroduce yourself on the record to begin. Good morning, Your Honors. Once again, Rafael Gonzales-Valiente from Código Gonzales-Ló in representation of Suiza Day. I believe I have three minutes left? Yes. Yes, Your Honor. First, I would like to re-stress what I was discussing earlier in as much as, in accordance with NIC, Suiza Day's claim for just compensation was born at the time of the faking, which was between 2003 and 2013. And NIC also says that regardless of any post-faking actions, it does not qualify that. The faking claimant is entitled to compensation. And in accordance with Jacobs, the essential nature of the claim is not changed, no matter what happens and what happens later. In other words, the signing of the stipulation did not change the essential nature of Suiza's claim. And that's why it doesn't matter that a stipulation was signed. It was still a faking claim. And thus, it's not dischargeable in accordance with the plan. Obviously, if this court confirms this report's decision. As to the FOMB's arguments regarding our proof of claim and the fact that it needs to go through a claims objection process, first of all, they did not argue this before the First Circuit. They did not even acknowledge that argument and did not file any opposition at all. So, they waived any arguments. So, any arguments that they raise now should be disregarded. Secondly, when they talked about the nature, they talked that our objection to claim was saying that our objection said that the plan misrepresented the nature and amount of the claim. We were talking about the dischargeability aspect of what they wanted to do with the plan. In other words, we were saying it was not dischargeable. We never thought and never ever expected that the plan was objecting to the taking nature of our claim, but as to the dischargeability nature of the claim. Finally, as to the release to third parties, again, the board never mentioned any of the arguments that they raised today in the first instance, so they waived them, but also in accordance with what they say, nobody owes SWISA for the just compensation. It's important to note that the settlement said that the public at large would repay the just compensation claim by using a regulatory accrual at this time. Thank you, counsel. Thank you. At this time, please mute your audio and video. Attorney Ramos-Luina, you have a two-minute rebuttal. Good morning again. For the record, Guillermo Ramos-Luina. I'm going to be very brief. In light of the clarification made by the Oversight Board's counsel pertaining to the Section 510 argument, I don't think there's anything for me to add at this point other than what's in the briefs. As to the Section 105, an interpretation of 105, we respectfully submit that applying the essential principles of bankruptcy law, that it's only reserved for honest debtors, is neither overriding or augmenting the powers or the sections or provisions of the bankruptcy code. It's simply applying those fundamental principles that are part and parcel of bankruptcy law. With that, if there are no other questions, I submit the rest of my arguments through the main brief and the reply brief. Thank you. Thank you. Thank you, Attorney Ramos-Luina. Please mute your audio and video. Attorney Rivera-Rios, if you could unmute your device and reintroduce yourself on the record to begin. You have two minutes. For the record again, Counselor Victoria Rivera-Rios. In the AFAPS and Oversight Board's argument, they plainly admitted that this approval order and confirmation order invalidated Acts 8081, and they also admitted that there is a certain injury as to all these police officers, which includes my five clients, the appellants, as to the pensions they have not received. Each one has been injured in that they have not received more than $20,000 in the past 19 months. And the reality is, with regards to the argument as to the order not being appealed as a collateral order, I'd like to cite this case where it says, failure to appeal an order under a collateral order doctrine does not bar a later appeal from the final order. It is well established that when the appellant appeals from the final judgment, that judgment necessarily incorporates all earlier interlocutory decisions, and by referring to the final order, the appellants present the whole case to us on appeal. That's the case of Infre Peachtree Lane Associates Limited, 188BR815,822. What do you cite for the proposition that an order approving a plan occupies the same relationship to a ruling and an adversary proceeding that a final judgment in a civil action does to a collateral order issued in the course of that judgment? Your Honor, the confirmation order, the findings of fact order, sorry, makes reference that the oversight board had modified the proposed plan and related documents previously requested, and previously requested that these acts be preempted by PROMESA. This was part of the final order. And because the court was not going to, the court understood that there was little findings of facts, as mentioned in the court order, that's in Supplemental Appendix 5, that's why they filed this adversary proceeding. And that adversary proceeding is directly related to this proposed plan that they were trying to do. Now, with this adversary proceeding, they were able to be able to confirm this plan, so it's indirectly related. Thank you.  At this time, Attorney Rivera-Rios, please mute your audio and video. Attorney Bienenstock, you have a four-minute rebuttal. Please reintroduce yourself on the record to begin. Thank you. May it please the court, Martin Bienenstock of Proskauer Rose for the Oversight Board as the Title III representative of the debtors. I'm going to restrict myself to the Fifth Amendment arguments. Number one, if the court had applied 944C, it would have simply said, I'm confirming the plan, but adding to the confirmation order that the takings claims are non-dischargeable. That is exactly not what the court did. The court issued a ruling in a very constructive way, saying, I'm not confirming your plan. You tell me what you want to do. And we said, okay, we'll change the plan to provide that the takings claims will be paid in full if that ruling survives on appeal. And the court accepted that and actually wrote, I'm preserving your right to appeal. But clearly, if the court had intended to apply 944C, that never would have happened. The court just could have written the takings claims in as non-dischargeable. Also, I can't emphasize enough that the plan is comprehensive. It allocates surpluses to certain parties who are not being paid in full. Every additional dollar we pay a creditor, like a takings claimant, is going to reduce the cash available for others. That's why I was saying earlier, 944C can't be used simply to lob additional claims in without a valid legal basis. And for all we know, we would have had to reload on the plan and things like that. Let me tell you from 50,000 feet what concerns me. If we accepted your argument, municipalities generally know well in advance when they're going to file bankruptcy that they may have to file bankruptcy. They're in great distress. It's gone on for a year or two. The debts are... And if we accepted your argument, any municipality right before it goes into bankruptcy could just find the land that they like the most, the properties they like the most, take them, and then file bankruptcy and only have to pay bankruptcy dollars. Wouldn't that be a ramification of what your basic position is? No, and Your Honor, Judge Swain asked me the exact same question. And the answer I gave Judge Swain and I offered to Your Honor is simply this. If there were any scintilla of evidence that that happened, the court could dismiss the case for lack of good faith. And there's nothing in this record to suggest that that happened. And going forward, it will be obvious if that happens. If there are takings willy-nilly once there are troubles in the debt world for the municipality, that would be obvious and the court could do something about it. That's not the case here. Number two, Section 944C does exactly what the government says it doesn't do. It says what claims are non-dischargeable. In fact, it starts by saying 944 says all debts are discharged except as provided 944C. And then it carves out a constitutional claim. People who have no notice of the case. It doesn't carve out takings claims. And that leads me to another important point. We have a class in this plan, Class 58 and 58A, and Your Honors can see it in docket number 17628. Page 24 is the approved disclosure statement. That class contains an estimated $2.75 billion of claims. They include tort claims and all the unpaid debts other than basically the bond claims and the retiree claims. May I just finish this thought? Yes. Thank you. If the Commonwealth's police force or fire force destroys somebody's house accidentally, there's a tort damage claim, and that's dischargeable. And under our plan, that's paid $0.204 on the dollar is the estimate. It makes no sense that the same house, if taken, gets 100% if it's a pre-petition unsecured claim. And the cases we cited in our reply brief, Stellwagen and Hanover Bank v. Moises, show that the bankruptcy power from the times in England, the Supreme Court has said, was understood to discharge all legal liabilities. They didn't say non-constitutional liabilities in Hanover National Bank. They said all legal liabilities. Thank you for the extra time. I appreciate it. Thank you.